BAKER-VAWTER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9325. Promulgated July 8, 1927.

> 1. The sale by a corporation of all of the capital stock of an affiliated corporation results in neither a taxable gain nor a deductible loss.
> 2. On the sale by a corporation of all the capital stock of a subsidiary company whereby the affiliation is terminated separate returns must be filed for each corporation for the remainder of the taxable year.
> 3. The evidence fails to show that agreements on the part of certain employees of the petitioner to subscribe for its stock under certain circumstances constituted invested capital.

*Louis B. Montfort, Esq.*, and *A. M. Colegrove, C. P. A.*, for the petitioner.

*George G. Witter, Esq.*, for the respondent.

This appeal is from the determination of a deficiency in income and profits tax for the year 1920 in the amount of $24,890.54. The petitioner alleges the following errors on the part of the respondent:

(1) The determination of a profit upon the sale of the capital stock of its subsidiary in the amount of the difference between the purchase price and the sale price of the stock.

(2) The elimination of the surplus of the subsidiary company from petitioner's invested capital from the date of the sale of the subsidiary's capital stock.

(3) The refusal to allow as invested capital the full face value of certain unpaid stock subscription agreements.

### FINDINGS OF FACT.

The petitioner is a Michigan corporation with its principal place of business at Benton Harbor, Mich. It was originally incorporated under the laws of Maine in 1905. From 1914 to 1916 it operated a branch store at Chicago, Ill. On March 1, 1916, pursuant to a general plan of reorganization, the branch store was incorporated under the laws of Illinois under the name of the Commercial Stationery & Loose Leaf Co., and the Baker-Vawter Co., the petitioner herein, was reincorporated under the laws of Michigan. For convenience the companies will be referred to hereinafter as the parent company and the subsidiary company.

The net assets of the subsidiary company at the date of incorporation had a book value of $51,549.34. The company was incorporated with capital stock of $45,000 par value. The balance sheet set up showed a surplus of $6,549.34. For these assets the subsidiary company paid over to the parent company all of its $45,000 of capital stock. All of this stock, except for directors' qualifying shares, was continuously held by the parent company and no additional stock was ever issued. Thereafter, the parent company carried on its books as an asset the $45,000 of capital stock of the subsidiary company.

For the taxable years January 1, 1917, to February 28, 1920, the petitioner was affiliated with its subsidiary and filed consolidated returns with it. The earnings of the subsidiary company for the taxable years January 1, 1917, to February 28, 1920, reported on the consolidated returns filed by the parent company, on the basis of which income and excess profits taxes were paid, were as follows:

| | |
|---|---:|
| Calendar Year 1917 (Loss) | $2,248.46 |
| 1918 | 9,338.31 |
| 1919 | 23,708.96 |
| 1920 | 3,012.84 |
| Total net profit | 33,811.65 |

During the entire period the business of the subsidiary company was carried on at the store in Chicago. The earnings of the company were realized from trading with the outside public. They were all reinvested in the business and no dividends were ever declared by the subsidiary company.

On February 28, 1920, the petitioner sold the capital stock of the subsidiary company for $60,000. In payment therefor the petitioner received $6,000 in cash and the balance in notes receivable. At the

date of the sale the surplus on the books of the subsidiary company was $35,003.69, and the book value of the stock of the subsidiary company was $80,003.69.

The petitioner did not report on its tax return for 1920 any profit from the sale of the capital stock of the subsidiary company. The respondent has determined that there was realized on the transaction a profit of $15,000, the difference between the amount originally paid for the stock and the amount received for it.

At January 1, 1920, the surplus of the subsidiary amounted to $31,990.45. This amount, less $6,549.34, the surplus at the time of incorporation, the petitioner included in its invested capital for 1920. Respondent has eliminated the surplus of the subsidiary from invested capital from the date of sale, February 28, 1920, resulting in a reduction of invested capital for that period in the amount of $21,270.77.

On January 31, 1920, the petitioner entered into agreements with certain of its employees, under which the petitioner agreed to sell to said employees 1,109 shares of petitioner's stock, par value $100, for $130 per share, making a total of $144,170. The stock agreement entered into in respect of each employee reads as follows:

THIS AGREEMENT, Made this 31st day of January, 1920, by and between the BAKER-VAWTER COMPANY, a Corporation, of Benton Harbor, Michigan, party of the first part, and Richard G. Sullivan of Benton Harbor, Michigan, party of the second part.

WITNESSETH: That the said first party agrees to sell to the second party, 50 shares of the Capital Stock of said Corporation of the par value of One Hundred ($100) Dollars per share, upon the following terms and conditions, to wit:

It is agreed that the purchase price for said stock is One Hundred Thirty ($130) Dollars per share, which shall be paid in the manner following, to wit: One Dollar and Fifty Cents ($1.50) per share per quarter, January 31st, April 30th, July 31st and October 31st. The first installment shall be paid on January 31st, 1920, and a like sum of One Dollar and Fifty Cents ($1.50) per share per quarter shall be payable on the last day of April, July, October, and January thereafter, until the stock is fully paid for.

It is further agreed that any and all cash dividends which may be declared from time to time shall be applied on said purchase price.

It is further agreed that the said purchaser shall pay interest on all unpaid balances at the rate of 5% per annum, said interest shall be accumulative, and shall be added to the purchase price of One Hundred Thirty ($130) Dollars per share.

It is further agreed that when the first party has received a sufficient amount on said purchase price to fully pay for ten shares of said Capital Stock, upon the terms and conditions aforesaid, that thereupon the first party will issue to the second party a certificate for ten shares of said Capital Stock upon request.

It is further agreed that in the event that the said purchaser should, at any time, by his own action, or by the action of the first party, or by death, cease to be an employee of first party before said contract matures and said stock has been fully paid for in the manner and upon the terms aforesaid,

then said contract shall cease and become null and void; and the purchaser, or his estate, shall receive and take from the first party the amount paid in on unissued stock plus cash dividends less 5% per annum on unpaid balances, in shares of the Capital Stock at the price named in this contract. And in addition thereto the said purchaser shall be entitled to take and have any and all stock dividends which may have been declared on the stock which has actually been paid for at the time of the termination of the contract; but in this connection it is understood that all stock dividends which may be declared on said shares of stock shall be held by the first party until this contract has been terminated, or the stock has been fully paid for in accordance with the terms of this contract.

It is further agreed that until said stock has been fully paid for in accordance with the terms of this contract, and certificates therefor have been issued to the second party, that title to said stock shall be and remain in the first party, and the second party shall have no right to vote said shares of stock at any stockholders' meeting until the same have been fully paid and the certificates representing said stock duly issued to the second party.

The subscribing employees, ten in number, were selected by the petitioner for their moral and financial responsibility and were at that time solvent and apparently able to carry out their respective agreements for the purchase of the stock. The petitioner declared cash dividends upon the full amount of stock thus subscribed for and these dividends were credited to the stock accounts of the various subscribers. The petitioner also declared substantial stock dividends upon the full stock subscriptions, amounting, in one instance, to 66⅔ per cent. The shares of stock representing these stock dividends were issued in the names of the various subscribers, but the certificates were held by the petitioner as a guarantee for the fulfillment of the subscribers' obligations.

The petitioner included in its invested capital for 1920 the total amount of stock subscribed for under the above agreement. Of this amount the respondent allowed for invested capital purposes only the amounts of cash paid on the subscription agreements during the year 1920, totaling $14,528.42, prorated from the date of payment. The respondent also included in taxable income the interest received by the petitioner upon the unpaid balances of the stock subscriptions.

OPINION.

SMITH: The first question to be decided in this appeal is whether the petitioner made any profit or sustained any loss in the year 1920 upon the sale of the capital stock of its subsidiary company. The facts are not in dispute. The petitioner during the year 1916 incorporated its branch store and took over the entire capital stock at $45,000 par value, in exchange for assets of a book value of $51,549.54. In the year 1920 it sold the capital stock of the subsidiary company, together with all of its assets, including earned surplus of a book

value of $35,003.69, for $60,000. Upon this transaction the petitioner claims that it sustained a loss of $13,454.35, while the respondent contends that the petitioner made a profit of $15,000. The petitioner claims its loss, not as a loss upon the sale of the capital stock of the subsidiary company, but as an operating loss, it being contended that the transaction was in fact a sale of assets of the parent company; that, since for income and profits tax purposes the separate companies must be treated as a single economic unit, the corporate entity of the subsidiary company from the day of incorporation may be entirely disregarded.

We have held in *Farmers Deposit National Bank*, 5 B. T. A. 520, that a sale by one member of an affiliated group of shares of capital stock owned by it in another member of the group is a sale by the affiliated group of its own capital stock and that such sale constitutes a capital transaction which does not result in either a taxable gain or a deductible loss. See also *United Drug Co.* v. *Nichols*, 21 Fed. (2d) 160.

We have also held in *H. S. Crocker Co.*, 5 B. T. A. 537, that where a corporation acquires the capital stock of its subsidiary at its book value and subsequently sells it at its book value no profit or loss to the affiliated group results. The present case is not distinguishable from these cases in any material respect. In the appeals referred to, we have relied solely upon the authority of the statute in adhering to the so-called single economic unit theory. The doctrine was not intended to have any broader application than there given. Certainly, there is no authority in the statutes or in these appeals for saying that a corporation which was validly incorporated and which continued to do business in a corporate capacity over a period of years never had any corporate existence. The facts are that the subsidiary company herein did exist as a distinct entity and that the petitioner purchased and sold its capital stock. The transaction was none the less a sale of capital stock because of the fact that all of the capital stock rather than a part was the matter of the purchase and sale, and that the sale terminated the affiliation. The sale did not terminate nor in any way affect the existence of the subsidiary company as an entity. The petitioner might have at any time dissolved the subsidiary company and sold its assets as such if it had chosen to do so. What the petitioner actually owned at the time of the sale and what it sold was not the assets, but the capital stock of its subsidiary and such a sale we have held can not result in either a profit or a loss.

On February 28, 1920, the affiliation ceased and each of the companies existed thereafter for income-tax purposes as a separate and

distinct corporation. The invested capital of each company from that date must, therefore, be computed upon the basis of separate returns for the remaining ten months of the year 1920. *American La Dentelle, Inc.*, 1 B. T. A. 575. Since the sale of the capital stock was a capital transaction the proceeds of the sale should be included in the petitioner's invested capital for the remainder of that year. *Farmers Deposit National Bank, supra.* The petitioner's invested capital was, therefore, the invested capital of the affiliated group, less the par value of the capital stock of its subsidiary, less the surplus of the subsidiary, plus the proceeds of the sale of the capital stock of the subsidiary.

The respondent has properly eliminated from the petitioner's invested capital the unpaid balance of the purchase price of stock subscribed for by its employees under the agreement set forth in the findings of fact. We have held in *Meadows & Co.*, 5 B. T. A. 241, that the value of a stock subscription agreement may not be included in invested capital. The petitioner in that appeal, as in the present one, relied upon *Hewitt Rubber Co.*, 1 B. T. A. 424, where the value of a promissory note paid in for stock at par value was allowed as invested capital. The difference between promissory notes and agreements of this nature clearly warrants a distinction. It is not a question of whether the subscribers were bound under the agreements as between themselves and the petitioner, but rather a question of the character and the value of the agreement to the petitioner as a capital asset. No definite value has been shown. An officer of the petitioner's bank testified that the bank would have made a loan to the petitioner upon these agreements to the extent of the bank's authorization for such loans, but only upon the endorsement and credit of the petitioner. We are not satisfied from the evidence that the stock subscription agreements themselves had a cash value or that they constituted property paid in for shares for invested capital purposes. *Central Consumers Wine & Liquor Co.*, 1 B. T. A. 1190.

The interest payments received by the petitioner under the agreements were, we believe, properly included in taxable income. They were not received as payments or credits for shares of capital stock and they were immediately available for general uses along with the petitioner's income from other sources.

Reviewed by the Board.

*Judgment will be entered on 20 days' notice, under Rule 50.*

Green dissents.